Mr. Adams, when you're ready. Thank you very much, Your Honor. So may it please the Court, it seems to me the best place to start is where this lawsuit started. And directing the Court's attention to page 193 of the Joint Appendix, this is the letter that was sent almost three years ago to my client. And you can see near the bottom of that page, it indicates, ITW has become aware that North Carolina Foam Industries, and that's Barnhardt's trading name in this particular business, has obtained Florida product approval, so-and-so, copies of which are attached. Both of these approvals require the application of a fillet foam to the joint between the wood rafter and the underside of the roofing decking. ITW believes that any application in accordance with either Florida product approval code would likely be an infringement of one or more of the claims of the 327 patent. Now, to make clear, ITW wasn't simply talking about what Barnhardt's customers might be doing. It goes on to say specifically in the next paragraph, we are notifying you of the 327 patent in order to provide NCFI an opportunity to cease or avoid any activities that would infringe any of ITW's rights in this patent. And then it goes further to say such activities would include providing or advertising any services which would infringe the claims of the 327 patent or providing advertising or other information that would induce another party to infringe the claims of the 327 patent. But you have a letter that says they'll never sue you. Where is your adverse, remember we're looking at Metamune, and it says that we're going to look at immediacy and reality to see if there's a real dispute here, but you have to have adverse legal interests before we even get there. What's your adverse legal interest? Your Honor, because our customers... That's an economic interest. I understand it's hurting you in the pocketbook. That's economics. What's your legal interest? With all due respect, and if you'll allow me, let me just propose a hypothetical or A legal interest is because any of those customers who see fit can bring any number of legal claims against Barnhart as a result of the claims brought against them by ITW. And there's authority from this court, the Dow versus Exxon case. Well that sounds a little speculative to start with, but even if that happens and gets through exhaustion and a few other things that strike me as real there, that still doesn't seem to me that you have an adverse legal interest with them. Well, Your Honor, I think that if you look at the totality of the circumstances test under Metamune, there are cases involving customers. I mean, this is not a new scenario. This is not a case... Let me see if I can clarify something here. The covenant not to sue, does that cover claims against you for induced and contributory infringement? It's unclear. The covenant not to sue says that they will not sue us for infringement. But my point in this... Well, this is important because it gets to what Judge Rader is asking, Chief Judge Rader is asking about. The point is that once a jurisdiction is established, the burden is on, in this case, on ITW to prove that it's ousted jurisdiction. So any ambiguity in terms of the covenant not to sue or the waiver given to Barnhart is construed against them, not against us. I'm losing something here. On the principle... Applying the principle of exhaustion under our precedent in Transcorp, why shouldn't we be construing this covenant not to sue as sufficient to cover cost the customers as well under the exhaustion theory? It seems to me the agreement here, the covenant, is very much like Transcorp. Well, I would be delighted if it did and our problems would all be over. But again, I think the point is that you're dealing here with a supplier, ITW and Barnhart. But I guess I'd like you to answer my question. I don't know if you're familiar with Transcorp. Yes, I am familiar with it. But can you tell me why then there wouldn't be exhaustion applicable in this case under the same theory applied in Transcorp? Well, and I think they're very likely... Well, you didn't raise that in your brief, so I'm just a little... That was not an issue before the court, whether or not the... Well, of course it's an issue. I mean, the question... You're coming in for a DJ was predicate on the fact that they can sue. Whether it's economic harm or legal harm, it's whether or not they can still... They still have the right to go after customers, viable right to go after customers. If that is extinguished, then this case is over. Well, no one raised that issue below. The court didn't raise it. Certainly, Barnhart didn't raise it. ITW obviously didn't raise it. She's asking you why you didn't raise it. Because the issue simply didn't come up in that context. If that's an oversight on my part, then I can live with that. But the issue here is the appeal from the decision of the district court. And the district court applying Metamune said that it simply wasn't sufficient to continue Article III jurisdiction notwithstanding the fact that ITW has made constant threats against both Barnhart and its customers but has chosen only to covenant its customers. The problem, practical problem... What Judge Prost is suggesting to you is you don't have any problem with respect to your customers if there is exhaustion. I understand that argument. No, I mean, well, I guess what you had a claim below that was dismissed with prejudice, right? With respect to a state law claim on unfair competition or something? Well, that was done with consent in order that this case would be appealable. There was a, there was an unfair competition claim that was left which would have required trying that case and then finding out what happened there and then taking an appeal and everything at the same time. But you would agree if we find that the covenant is sufficient to cover the interests of the customers, then there is no D.J. jurisdiction, right? And there's no claim against the customers either. I agree with that entirely. Any claim against the customers would, the defense would be you've exhausted your claim against the customers about the type of covenant. Now, you said you didn't raise it because you thought it was ambiguous. So, I guess I'll take the other side now. Isn't it too ambiguous for us to conclude that there was exhaustion here? I don't think that's an issue before the court. I don't think that's an issue here. I think the issue here is whether or not, and that issue, with all due respect, that issue would arise if and when ITW actually sues one of Barnhart's customers. That would be an issue to be raised by the customer. And if Barnhart were involved in the case, that would be an issue to be raised at that point. But as it stands now, because Barnhart brought this action, there haven't been any lawsuits against the customer so far as we know. Yeah, but if we were to find D.J. jurisdiction, we would have to find, whether you say it's an economic interest or a legal interest, that you have some liability here. And if we construe the covenant as to include customers, then you lose on D.J., right? Well, if that's the way the court wants to go at it, you wouldn't get any objection from Barnhart because we didn't want this declaratory judgment action. If it was clear to us that whatever type of covenant was given to Barnhart extended to the customers, then that's all, the case is over as far as we're concerned. Mr. Adams, what happens if we grant declaratory judgment jurisdiction and the patent is found not invalid, it's very valid, and then they sue your customers? Can your customers re-litigate the validity question? And if so, what's the purpose of the first D.J. action in the first place? I don't believe that the customers could re-litigate the validity action. They're sued independently for infringement, I think. I don't think that's, I don't think that's a, yes, and their defense is going to be invalidity. I think if, and I think that's always there. I'm sorry, the proposition was that in the case between Barnhart and ITW, the patent is upheld. It's upheld and now they sue your customers and the customers want to re-litigate invalidity. Can they do it? I don't know. The answer is yes, they can. Then why do we worry about the first one in the first instance anyway? The customers are not a party to the action, so there wouldn't be any race judicata effect or, you know, collateral to the customer. Precisely, so they can, so what's the purpose of this first D.J. action? Well, because it will resolve both the validity and the infringement issue. Remember that it's the Florida production, it's the Florida product is a specific claim to a specific process. These are process claims in the patent. I was using that to show that your real harm is economic, not legal. With all due respect, Your Honor, that, I don't, first of all, I don't read MetaMun as saying that there has to be both economic and legal harm. That is something that appeared most often in the cases before MetaMun, but I think that the real issue here is, as far as legal harm, is the fact that ITW has made it clear that they're not going to give a covenant to the customers and so it's just a matter of time before a customer gets sued. But you just said that this would resolve the validity issue, but under the Chief's hypothetical, you agreed, I think, that it would not resolve the validity issue vis-a-vis the customers, right? Well, that would be a question between ITW and the customer, and it would be a matter for us if the customer saw it in some manner to bring us in, but again, the way I read MetaMun and the way it talks about the totality of the circumstances is that it was trying to get away, to some extent, from sort of the rigid hyper-technical rules that had sometimes been applied and it, in the Supreme Court's view, simply didn't make a whole lot of sense. And the whole question of economic versus legal harm is, with all due respect, somewhat arbitrary as distinct when Mr. Barnhart is sitting there wondering why all of his customers are peeled away because they're getting threatened with lawsuits because they're using a Florida-approved installation technique that they sponsored. I mean, this is something that Barnhart went to Florida and did. They proposed to the state of Florida a particular way of installing this phone that would meet the required standards for wind resistance and so forth and so on. So, we have a finite process which either infringes the ITW patent or it doesn't. And I think that, as I say, there are customer cases, and this is not a new case, and I respectfully submit that the WS case... But I don't think there are any customer cases that have found standing in this context without an indemnification liability or a potential inducement liability. Well, Your Honor, in the synopsis case, it came very close. And that was a case where synopsis was making a product. That's a District Court case? It's a Federal Circuit case, if I'm not mistaken, Your Honor. Judge Rader was the author. In synopsis, the declaratory judgment plaintiff was making a particular case. Synopsis, Your Honor. It's listed in your appendix as Northern District of California. I believe they're... The one I wrote, I think, is the Carrico case. Am I right on that? I stand corrected. In any event, the synopsis case was a case where the apparatus... Yeah, well, the problem is if it's a District Court case, it's not binding on that. Well, no, it's not binding. But, Your Honor, it's a studied and satisfying opinion. I think it merits the Court's attention. And I think also the WS opinion, which is also a District Court opinion, it was very well thought out and very reasoned. Those cases are not on all fours with this case, but they both are post-metamine cases. They both address the question of what happens when you have a covenant given to, in this case, in the synopsis case, a manufacturer, but you leave the customers out there hanging. And in synopsis, there was a method patent, and there was an apparatus being sold by the declaratory judgment plaintiff. There was no possibility of, under the covenant, for the plaintiff to be sued for making the apparatus under the process. Would you like to save your rebuttal time, Mr. Rafferty? Yes, Your Honor. Okay, thank you. Mr. McIntyre? Thank you, Your Honor. You're welcome. Thank you. Let me get right to the heart of it. As to... Let me ask you first before you get to that. Does this covenant not to sue cover claims for induced and contributory infringement? That's exactly what I was going to say. We say that in our brief. We, the reason the district court... You represent that it covers all infringement claims. That's correct. And the district court understood it as such. Well, infringement would have to cover all forms of infringement, right? Correct. And Chief Judge Rader, as to your question about legal, adverse legal interests, there are none. Obviously, that flows from the broad scope of our covenant. That was made... That requirement of adverse legal interests existed before a metamune, exists after a metamune in these cases. And specifically, I can point to what microchip was before. This is quite a... I'm trying to find a proper adjective that doesn't offend you, but this is quite a strategy, isn't it? You don't... You give them the covenant not to sue them, so they can't come after the validity of your patent. And then you go after all their customers, knowing you'll drive them to your licensees. And if you don't drive them to the licensees, you probably won't sue them because you undercut Barnhart's business enough anyway. So the economic interest here is being perfectly satisfied by not using the courts and suing for infringement. I think you're, with all due respect, reading too much strategy into the course of events here. I'm reading strategy in, but I want you to address whether that strategy is what's really going on and whether we should be awake to that. No. Well, first of all, let me answer. Let me give you some history here. First of all, if you look at the Florida product approvals themselves, they're not in the joint appendix, but they are in the record. They were attached to Barnhart's, some exhibits to Barnhart's opposition to our initial motion to dismiss. This is a pure method patent. Barnhart makes non-infringing chemicals that its applicators combine to produce a flammable powder. How do you threaten them with infringement if it's irrelevant? If you'll allow me to finish, I'll get to my point. The Florida product approvals do not dictate a step-by-step method that would directly infringe the 327 patent. That's why we put likely in there. In the course of this investigation, we learn what Barnhart actually does and we give them a covenant. However, this is not a two competitor market. There are numerous competitors and sources for these chemicals to make foamable polymer adhesives. There are multiple uses for foamable polymer adhesives beyond reinforcing roofs against hurricane force winds. It is the customers or the applicators who can source these from folks other than Barnhart, other than us that would actually directly infringe the method claims of the 327 patent. So that's why the ITW will not extend the covenant to customers because we don't want to be in a position where a customer will later say, wait a second, you gave a covenant to us vis-a-vis the Barnhart case. You can't sue us even though we're buying the stuff. Okay, I'm a little unclear. So you're saying you're agreeing that the sales to Barnhart's customers are authorized under the covenant? No, I'm not agreeing with your Transcorp argument, Judge Krauss. And let me tell you why. One, Transcorp involved a product, not a method patent. Now, I know the Supreme Court in Quanta has said patent exhaustion can apply to a method patent, but that's only when the product can be used to practice the method exclusively. And here, as Nelson Clark, one of the Barnhart executives, stated in a declaration he submitted to the lower court, the foamable polymer adhesives... A lot of non-infringing uses. Lots of uses. And in fact, the brand name that Barnhart markets its chemicals under is called Insulstar, which suggests more of an insulation application than an adhesive for reinforcing roofs against hurricane force winds. The second reason... So I would submit to you that patent exhaustion does not apply here for that very reason because they're selling non-infringing chemicals. And the customer is the one who combines them to produce the foamable polymer adhesive. We don't claim any particular foamable polymer adhesive in the patent. And so Transcorp has no relevance to this case, Your Honor. So in lots of areas, there is customer... There is standing as a result of economic injury, right? We've had cases in our own court recognizing that economic injury can confer standing. Well, not economic injury alone. Yes. There's usually economic injury plus. And I think you're referring to the Arrowhead case? No, I'm not talking about the patent area. I'm talking about cases that weren't cited in the briefs. There are cases... Oh, plenty. I would agree with you. But usually those arise in the situation where there's indemnification is demanded and obtained. No, no, no. They are not cases involving indemnification. They are pure cases in which somebody sues because of injury to the customer. But they are cases in which there is a regulation or a statute or something like that, which has adverse effects because it affects the customers. I'm not... Without some more specificity, I cannot identify... McRae versus Boron, the Supreme Court case, for example, allowed a liquor distributor to sue because of injury to its customers. It had third-party standing. Why do those cases recognizing standing to sue based on economic injury not apply in the patent area? Why should the patent area be different? Well, I can answer that by saying that this Court's cases, both in Microchip and in Benetech Australia, have stated pretty unequivocally that an economic interest alone does not confer an actual case or controversies. And as to the economic injury that's apparently assumed so far, I would say this. There was no competent evidence ever produced by Barnhart in the trial court that it lost a single customer or a single sale because of letters that ITW sent to a couple of customers two and a half years ago. So I would not assume even economic injury in this case. And I want a larger point here is that the chain of events that Barnhart is presenting as giving rise to an actual case or controversy is literally the hypothetical state of facts that Judge Justice Scalia said in Metamune does not present a real and immediate controversy between parties having adverse legal interests. It's simply, we're talking about a very attenuated set of facts here that would be hypothetical facts. I submit to you that this court's decision in Dow Jones versus Ablaze really is very significant here. Not a customer case. Well, it's even, I think this situation is more attenuated than even the situation in Dow Jones. Chief Judge, former Chief Judge Michelle stated that Ablaze was trying to keep in news, had served discovery on news corporation, had sued other Dow Jones affiliates. And Ablaze was saying, wait a second, news corporation is, because of all of that activity, they're really de facto parties. And Justice, former Chief Judge Michelle said, whether at some future point, Ablaze would sue news corporation for infringement is irrelevant to whether a controversy existed between Dow Jones and Ablaze. What if hypothetically, there were three customers here and the other side could come in and demonstrate that the customer had all switched after they got the threatening letters. They had all been driven away from Barnhart because of the threats of infringement that your client sent them. Would that be sufficient? No, that's still just, even under that hypothetical state of facts, that's still economic alone, economic interest alone. Again, the court has said on numerous occasions that to the extent Barnhart wants to clarify its customer's rights under the 327 patent, that is not sufficient to confer an actual case or controversy. That is clear in this court's case list. Well, actually those cases, microchip relies on a reasonable apprehension standard. Benetech Australia, which is post-metamune, and I think Judge Dyke, you wrote a dissent in that case, mainly on the burden of proof, but in Benetech Australia, that statement and principle was echoed throughout that case. So doesn't it seem a little inconsistent? It's sort of the bet, you're not required to bet the farm language in metamune that clearly if there were indemnification contracts with the customers here, there would be jurisdiction, right? But in the absence of indemnification contracts where there's still potentially some liability for the customers to go after Barnhart, there's no DJ jurisdiction. I'm not going to concede an actual case of controversy in the presence if there were indemnification agreements. I'd want to see them, see if there are qualifications, conditions, whatever. There may be other facts that attach to your hypothetical that would give rise to an argument, but I would say Barnhart would have a better argument to sustain an actual case or controversy. Under the right circumstances, the manufacturer here has a choice. Either he's going to put himself on the hook for indemnification contracts or he's going to stand the likelihood that he's going to lose all of these customers to a competitor because they're getting these threats of infringement. Is that the choice you would put? No, it's not a Hobson's choice here. I think that Barnhart's conduct and actions belie that hypothetical. If it's not a Hobson's choice, what's the way out? I mean, if taking Judge Rader's, Chief Judge Rader's earlier question to you, suppose this were designed as a way to steal away the customers and to prevent Barnhart from being able to do anything about it in court. Suppose that were the situation here. I know you say it isn't, but suppose it were. Is Barnhart helpless under those circumstances? Helpless in what sense? Well, no legal relief. I mean, you say you gave them a covenant not to sue, you guys go away, and now we can go and threaten your customers. There's nothing you can do about it. They can sell. I think the court is perhaps operating under a misdemeanor hedging. They have to indemnify at least one customer. Is that what you're saying? No, I'm not saying that either. I'm answering Judge Dyke's question and that is there are many uses of their personal property and their chemicals. They are not going to go out of business if one customer goes away. You're changing my hypothetical. My hypothetical is that the chemical only can be used for this one application in this process. You give a covenant not to sue against the manufacturer and then you threaten the customers. And does the manufacturer have any legal remedy under those circumstances? Absent additional facts under the current case law, there wouldn't be a case or controversy. If you start to introduce other indicia beyond just a pure economic interest, then perhaps, like I said, they would have a better argument. But on these facts that we have... In my hypothetical, there's no remedy. Pardon? In my hypothetical, there's no remedy. You're talking purely economic interest. Why is that not the Hobson's choice that you said was not here? You're giving the Hobson's choice of giving your customers indemnification clauses or losing them. That's the choice here without any recourse to the courts. If we're trying to explore how far this line goes, which I think is what we're doing here, the questions are becoming, again, about hypothetical state of facts that weren't before the district court, aren't before this court. And again, that question about how far do we go under metamune, I don't think has been addressed by any court. Because if you look at any of the courts that Barnhart cites, there's always something more than pure economic interest involved. And this court has said both before metamune and after metamune that economic interest alone is not enough. I would say, I think the district court correctly held that a declaratory judgment action is not sustained by the mere possibility that a Barnhart customer who purchases non-infringing chemicals from Barnhart might seek indemnification from Barnhart if ITW were to sue that customer in the future for infringing the method claims of the 327 patent. And again, at this point, Barnhart and ITW have no adverse legal interests. And I will make this clear, Barnhart cannot be sued under a covenant for directly or indirectly infringing the 327 patent. And I want to close by saying this court has stated on numerous occasions that the residual possibility of a future infringement suit based on a party's future acts is simply too speculative a basis for jurisdiction over a declaratory judgment claim of invalidity. So certainly— And in your view, the notice of the letters threatening infringement were not sufficient? Here, there were more than just the possibility. I mean, any one of us could possibly be charged with infringement at some future date on any product. Here we have threatening letters to the customers. Vis-a-vis the customers and ITW, not Barnhart and ITW. My point is that it follows that if based on this court's statements starting in SuperSAC, Amana, continuing through Benetech, Revolution Eyewear, that statement exists throughout this court's cases in this area. And it follows, to me, it would seem that it follows that a possible future infringement suit against a Barnhart customer who might seek indemnification on some unidentified theory— Okay, I think we've got Mr. McIntyre. Thank you. All right, thank you. Mr. Adams, you have a little over a minute and a half. I'll be brief. Just a couple of points. First of all, Mr. McIntyre has gone way outside the record in supposing that there's no evidence of injury. All I suggest you do is look at the joint appendix. For example, 199-202-208-210, the privilege log, which contains numerous other threats or apparent threats to customers and references to infringement by Barnhart and the customers, all of which was produced during this lawsuit. Is he right in his response to the exhaustion theory that you belatedly embraced as a result of our questioning that the customers could be performing infringing uses, non-infringing uses, or whatever, and this method claim it's too complex to make a determination about whether or not the ability to sue them has been exhausted? I think you look at the Florida approvals and again, that's outside the record. I think the Florida approvals, it's referred to in ITW's letters. They're getting into Rule 11 territory. If they're saying now that the Florida approvals, which they made specific reference to in accusing both Barnhart and its customers of infringement, now can't be interpreted as saying anything about whether or not there's infringement. But remember what the district court judge said the correct approach was. He said this to me in open court and he repeated it in the brief. Judge Whitney said, well, the appropriate thing to do, Mr. Adams, is just for Barnhart to sue all of its customers, bring D.J. actions against all of its customers to establish that it doesn't have in any indemnity obligations to those customers. Is that really where we want to be? But you could indemnify one, couldn't you? And then you'd have a legal interest. We could and I hold out the possibility that that might happen. But you know what happens is it's a game of whack-a-mole. Anybody we indemnify, ITW's just going to give them a covenant not to sue. No jurisdiction. And so it's— Sounds to me like you're winning that race. Well, it's not a financial race or a legal race that Barnhart had any interest in. I mean, it did not bring this action because it wanted to. It brought it because they were confronted with a direct, explicit claim of patent infringement. And they see it as both an economic and a legal issue. And I don't agree with Mr. McIntyre that the term legal interest and legal injury are synonymous. The metamine case speaks in terms of legal interests. And it's definitely in Barnhart's legal interest that this patent not be there. So, it doesn't have— Final thought for us, Mr. Adams? Beg your pardon? You have a final thought for us? That is it. Thank you. Thank you very much.